**Hahn & Hessen LLP**
488 Madison Avenue
New York, New York  10022
Telephone:  (212) 478-7200

John P. Amato
jamato@hahnhessen.com
Robert J. Malatak
rmalatak@hahnhessen.com

**Lewis and Roca LLP**
40 North Central Avenue
Phoenix, Arizona  85004-4429
Telephone: (602) 262-5311

Richard A. Halloran, State Bar No. 013858
Direct Dial:  (602) 262-0213
Direct Fax:  (602) 734-3746
EMail:  RHalloran@LRLaw.com
Shane E. Olafson, State Bar No. 4158556
Direct Dial:  602 262-5327
Direct Fax:  602 734-3756
EMail:  SOlafson@LRLaw.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| **TECO Electric & Machinery Co., Ltd**., | ) |
| | ) No. |
| Plaintiff, | ) |
| | ) **COMPLAINT** |
| vs. | ) |
| | ) |
| **Vincent F. Sollitto, Jr**., **James Li**; and | ) |
| **Wayne Pratt**, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff TECO Electric & Machinery Co., Ltd. ("TECO" or "Plaintiff"), by and
through its co-counsel Lewis and Roca LLP and Hahn & Hessen LLP, hereby files this
complaint, against Vincent F. Sollitto, Jr. ("Sollitto"), James Li ("Li") and Wayne Pratt
("Pratt") (together, "Defendants") and, in support thereof, alleges:

## NATURE OF THE ACTION

1.        In late 2006 through mid 2007, Defendants -- corporate officers and
directors of Syntax-Brillian Corp. ("SB" or "Syntax-Brillian"), a designer, developer and
distributor of LCD (liquid crystal display) televisions and HDTVs (high-definition
televisions) -- caused SB to file corporate financial disclosures with the United States

Securities and Exchange Commission ("SEC") which appeared to reflect a company with strong revenues and earnings and tremendous growth potential.  Defendants buttressed SB's corporate filings with public statements, all of which ultimately served their intended purpose of permitting SB's stock to publicly trade in the artificially high range of $6.00-$7.00.

2.      In or around June 2007, SB approached TECO and asked whether it would be willing to provide SB with a substantial amount of strategic financing in return for an equity interest in SB.  Because of SB's apparent financial strength and seemingly solid stock price, TECO took an immediate interest in SB's proposal and conducted its due diligence review.  Unbeknownst to TECO, the financial information which Defendants supplied TECO for its review and the specific statements that Defendants made directly to TECO, were materially false.

3.      On August 23, 2007, TECO (not knowing the falsity of the documentation and statements upon which it was relying) executed a Securities Purchase Agreement (the "Agreement") with SB, pursuant to which it purchased approximately 3.1 million shares of SB's common stock for approximately $6.50 per share, for a total cash outlay of $20 million.  On September 12, 2007 -- a mere three (3) weeks after TECO made its $20 million investment -- SB, in two stunning press releases, announced: (1) dismal 2007 fiscal year-end results; (2) first quarter 2008 fiscal year projections that were significantly below reported expectations supposedly due to anticipated weak sales in China; and (3) the resignation of its then Chief Financial Officer, defendant Pratt.  All of these facts were known to Defendants before, and at the time, they induced TECO to make its investment, but nonetheless, Defendants did not disclose such facts to TECO, choosing instead to intentionally and fraudulently lead TECO to believe SB was a healthy company.  These revelations caused SB's stock to take a huge hit, so much so that on September 13, 2007, its stock dropped to $4.01 (reflecting a 34.6% drop), causing TECO to sustain a loss of nearly $7.7 million in a single day.

4.      Bad news concerning SB's financial condition continued to pour out of the company, causing SB's stock to precipitously drop.  Finally, on April 18, 2008, SB was forced to *admit* in a press release that its financial statements for its entire fiscal year 2007 could not be relied upon and "may likely require restatement."  SB ultimately filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on July 8, 2008.  According to SB's Chapter 11 petition, SB's assets have declined in value by approximately $375 million between September 30, 2007 and July 8, 2008, and the entire stockholder equity in SB has evaporated (a total diminution of nearly *one-half billion dollars*).  Thus, TECO's equity interest has been totally wiped-out.  SB is currently being investigated by the SEC, and will (along with its officers and directors) be investigated by the Bankruptcy Court-appointed examiner, as well as the Official Unsecured Creditors Committee.

5.      TECO seeks monetary damages for, among other things, the false and misleading statements which Defendants, as SB's officers and directors, knowingly made to TECO in order to (and, in fact, did) induce TECO to enter into the Agreement, and ultimately suffer a $20 million loss.

## JURISDICTION AND VENUE

6.      The claims alleged herein arise under and pursuant to, among other laws, Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78r(a) and 78t(a)) and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5 (17 C.F.R. § 240.10b-5).

7.      This Court has jurisdiction over the subject matter and the parties pursuant to Section 5.9 of the Agreement, Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

8.      Venue is proper in this District pursuant to Section 5.9 of the Agreement and Section 27 of the Exchange Act.  SB's principal executive offices are located, and many of the acts and transactions alleged herein occurred, in substantial part, in this District.

9.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate and international commerce, including the United States mails, interstate and international communications and the facilities of the national securities exchanges.

## THE PARTIES AND SYNTAX-BRILLIAN

### A.     Plaintiff

10.     TECO is a publicly-held Taiwan-based company, having worldwide business operations, and is a leading manufacturer of heavy electrical industrial brand home appliances, telecommunications equipment, IT systems, electromechanical components, and commercial electronics.

### B.     Syntax-Brilllian

11.     Upon information and belief, SB is a Delaware public company that sells its LCD televisions and HDTVs in the United States, under the brand-name Olevia, directly to top retailers and through distributors to consumer electronics retailers, such as Circuit City, CompUSA, Sears, Target, Amazon.com, and RadioShack.com.  In Asia, SB sold its televisions exclusively through South China House of Technology ("SCHOT"), its sole Asian distributor.

### C.     Defendants

12.     Upon information and belief, Sollito is an individual residing at 7760 E. Gainey Ranch Road, Scottsdale, AZ 85258-1611.  Sollitto was SB's Chief Executive Officer ("CEO") and Executive Chairman of SB's Board of Directors ("BOD") at all relevant times.  On or about October 1, 2007, Sollitto was replaced by Li as CEO, but retained his role as Executive Chairman of SB's BOD until he resigned on or about June 30, 2008.

13.     Upon information and belief, Li is an individual residing at 718 Charleston Drive, Claremont, CA 91711-2249.  Li was SB's President at all relevant times and replaced Sollitto as SB's CEO on or about October 1, 2007.  On or about June 30, 2008,

Li resigned his director position and, on or about July 2, 2008, SB's BOD terminated Li in his role as President.

14.     Upon information and belief, Pratt is an individual residing at 13710 E. Queen Creek Road, Chandler, AZ 85286-0239.  Pratt was SB's Chief Financial Officer ("CFO") at all relevant times until he resigned on or about September 12, 2007.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### A.     Defendants' False And Misleading Statements

15.     On October 20, 2006, Defendants caused SB to file with the SEC its Form 10-Q/A filing (amending its May 31, 2006 Form 10-Q/A and May 15, 2006 Form 10-Q filings) (which were signed by Sollitto and Pratt), in which it reported its financial results for its third quarter of 2006 for the quarter ended March 31, 2006 ("Third Quarter 2006"), specifically reporting (a) $133.2 million in net sales (up 123% from the third quarter 2005); (b) accounts receivable from SCHOT of $9.6 million (constituting 25.6% of SB's total accounts receivable); (c) net inventory of $25.7 million; and (d) deposits with Taiwan Kolin Co., Ltd. ("Kolin") (SB's key Taiwan supplier, and a major SB stockholder) of $8 million.

16.     Defendants certified SB's Form 10-Q/A by stating that "[a]s of the end of the period covered by this report, [Sollitto] and [Pratt] have reviewed and evaluated the effectiveness of our disclosure controls and procedures ….  Based on their evaluation, [Sollitto] and [Pratt] have concluded that our disclosure controls and procedures are effective and sufficient to ensure we record, process, summarize, and report information required to be disclosed by us in our periodic reports filed under the Securities Exchange Act within the times periods specified by the [SEC's] rules and forms.  During the period covered by this report, there have not been any changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."  Additionally, Sollitto and Pratt certified, among other things, that "the financial statements, and other information included in this report, fairly present in all material respects the financial condition,

results of operations and cash flows of [SB]." Sollitto and Pratt similarly certified SB's Form 10-K and 10-K/A for FYE 2006, Form 10-Q and Form 10-Q/A for its First Quarter 2007, Form 10-Q for its Second Quarter 2007, Form 10-Q for its Third Quarter 2007, and Form 10-K for its FYE 2007 (hereinafter defined).

17.     On October 20, 2006, Defendants caused SB to file its Form 10-K/A with the SEC (amending its September 13, 2005 Form 10-K filing) (which was signed by Sollitto and Pratt), in which it reported its financial results for its fiscal year ended June 30 2006 ("FYE 2006"), specifically reporting (a) net sales of $193 million (up 134% from fiscal year ended 2005); (b) accounts receivable from SCHOT of $27.5 million (constituting 54% of SB's total accounts receivable); (c) net inventory of $13 million; and (d) deposits with Kolin of $5 million.

18.     On February 16, 2007, Defendants caused SB to file its Form 10-Q/A with the SEC (amending its November 6, 2006 Form 10-Q filing) (which was signed by Sollitto and Pratt), in which it reported its financial results for its first fiscal quarter of 2007 for the quarter ended September 30, 2006 ("First Quarter 2007), specifically reporting (a) net sales of $87 million (up 218% from first quarter 2006); (b) accounts receivable from SCHOT of $53.4 million (constituting 69% of SB's total accounts receivable); (c) net inventory of $41 million; and (d) deposits with Kolin of $15 million.

19.     On February 8, 2007, Defendants caused SB to issue a Form 8-K through which it released its financial results for the second fiscal quarter of 2007 for the quarter ended December 31, 2006 ("Second Quarter 2007"), specifically reporting (a) "record" revenue of $242.5 million (up 303% from second quarter 2006); (b) net income of $14.8 million (compared with a net loss of $1.3 million for the second fiscal quarter of 2006); and (c) accounts receivable of $123.5 million from SCHOT reflecting a $70.1 million increase, or more than 130%, from the prior fiscal quarter. In announcing these results, Sollitto stated that "I am extremely pleased with the performance of our team this quarter .... Revenue and earnings hit new records as sell-through of the Olevia brand at the retail

level continues to exceed our expectations and we expand distribution into new national channels."

20.     On February 14, 2007, Defendants caused SB to file its Form 10-Q with the SEC for the Second Quarter 2007 (which was signed by Sollitto and Pratt), in which it repeated the financial results previously announced in its Form 8-K and also indicated that for the first six months of fiscal year 2007 ended December 31, 2006, its cash flow from operations was a negative $46.5 million.  Specifically, SB stated that "[t]he operating cash outflow during the six months ended December 31, 2006 was primarily the result of increases in accounts receivable and inventories ...," and assured the public that "[w]e believe that the cash from operations and the increased credit facilities will be sufficient to sustain operations at the current level for the next 12 months."

21.     On May 10, 2007, Defendants caused SB to issue a press release (through its Form 8-K, which was signed by Pratt) wherein Sollitto increased the revenue guidance "to a range of $975 million to $1.1 billion" for the full calendar year.  Sollitto further represented that  "The success of our advertising campaign has resulted in increased demand for our Olevia HDTVs …."  In a later section of the same release entitled "Business Outlook," it was represented that "[f]or the calendar year ending December 31, 2007, [SB] anticipates revenue in the range of $950 million to $1.1 billion, and gross margins in the range of 16% to 18%."

22.     Also on May 10, 2007, Defendants caused SB to issue a Form 8-K through which it released its results for the third fiscal quarter of 2007 for the quarter ended March 31, 2007 ("Third Quarter 2007"), specifically reporting (a) net sales of $162.9 million (up 257% from the prior year); (b) net income of $5.5 million (compared with a net loss of $11.4 million for the third fiscal quarter of 2006); and (c) accounts receivable of $170.8 million from SCHOT (the accounts receivable owed to SB from SCHOT increased by $47.3 million from the prior fiscal quarter and sales to SCHOT accounted for 39% of the company's total revenue).  In connection with these results, Sollitto stated

7

that "I am extremely pleased with the results this quarter .... our revenue outlook for the full calendar year has now been increased to a range of $975 million to $1.1 billion."

23.    On May 11, 2007, Defendants caused SB to file a Form 12b-25 with the SEC requesting additional time to file its quarterly report for the period ended March 31, 2007.  Despite SB having completed its acquisition of Vivitar, Inc., a provider of cameras and digital imaging equipment, on November 21, 2006, SB stated that the acquisition was the reason for its inability to timely file its quarterly report.

24.    When Defendants ultimately did cause SB to file its Third Quarter 2007 Form 10-Q (which was signed by Sollitto and Pratt), SB reported that (a) revenues for the Third Quarter 2007 increased by $117.2 million or 257% to $162.9 million from $45.7 million in the Third Quarter of 2006; (b) year-to-date revenue was $492.4 million (up 270% from revenue of $133.2 million for the nine months ended March 31, 2006); (c) net income in accordance with Generally Accepted Accounting Principles ("GAAP") for the quarter was $5.5 million compared with a net loss of $11.4 million for the third quarter of 2006; (d) GAAP net income for the nine months ended March 31, 2007 was $21.4 million compared with a net loss of $13.4 million for the comparable period of the previous year; and (e) GAAP diluted net income per share was $0.09 for the third quarter of fiscal 2007, compared with a diluted net loss per share of $0.26 for the third quarter of fiscal 2006.

25.    On May 23, 2007, SB announced that it had priced a public offering of 25.6 million shares of its common stock at $5.75 per share, of which $14.1 million of the proceeds would go to selling shareholders other than SB.  SB's stock closed at $6.20 per share on that day.  The offering was managed by Merrill Lynch & Co., which also held, together with other underwriters in the group, an option on as many as 3.8 million additional shares.

26.    On July 16, 2007, Defendants caused SB to issue a Form 8-K, which included a press release that "provided updated information with respect to its results for

the quarter ended June 30, 2007 and updated revenue guidance for the calendar year ended December 31, 2007." In the July 16th press release, Pratt was quoted as follows:

>    In our quarterly earnings release on May 10, 2007, we provided revenue guidance for the quarter ended June 30, 2007 of $190 million to $210 million on unit volumes of 240,000 to 270,000 units.

>    *     *     *

>    While the results of the quarter have not been finalized, we believe that revenue for the quarter will be within that range. Additionally, we believe that gross margins will be within or above the top half of the range of 15% to 17% that we had previously forecasted.

>    *     *     *

>    Moreover, during the quarter ended June 30, 2007, we collected $129.6 million of cash from [SCHOT], our Asian distributor, and as of June 30, 2007 there were, as expected, no invoices outstanding for more than the stated 120-day terms. Finally, we continue to experience strong demand for our products and have had success penetrating additional retail accounts during the first half of 2007. As a result of this strong demand and the deployment of the proceeds of our public stock offering in May as well as the cash from the accounts receivable collections, we are raising our revenue outlook for the calendar year ending December 31, 2007 from our previous range of $950 million to $1.1 billion to a revised range of $1.1 billion to $1.3 billion.

27.    The July 16th updated guidance was the second guidance update for calendar year ending December 31, 2007, that Defendants caused SB to issue in less than 5 months.

**B.    Li Solicits TECO To Make An Equity Investment In SB**

28.    In early June 2007, Li contacted TECO's former Chairman, Theodore M.H. Huang ("Chairman Huang"), to schedule a meeting to discuss a business opportunity. Shortly thereafter, Chairman Huang and Eugene Huang ("Eugene") (also of TECO) met with Li, and at the meeting, Li asked whether TECO would be interested in making an equity investment in SB. Chairman Huang and Eugene expressed interest in SB's proposal, but stated that TECO would first need to conduct due diligence, to which Li agreed.

9

**C.     TECO Conducts Its Due Diligence Review**

29.     TECO assembled its due diligence team, and, on or about July 24, 2007, the team traveled to SB's United States' offices located in Los Angeles, California, to conduct its review which lasted several days.  SB (through, among others, Li, Pratt and Sollitto) provided TECO's team with, among other things, the documents identified in paragraphs 15 through 26, hereof.

30.     During the course of TECO's due diligence review, Li confirmed SB's bullish public filings and statements.  For example, when asked about the fact nearly 50% of its revenue is derived from SCHOT, Li stated, among other things, that there were "no problems" with SCHOT, that SB had a strong relationship with SCHOT, and that SCHOT was a good business partner because, due to its relationship with the Chinese government and its wide distribution channels in China, it had the ability to sell SB's products.  Li also said that he estimated SB's 2008 revenues to be $2.2 billion.

31.     After TECO completed its formal due diligence review, in early August 2007, Eugene had several in-person meetings with Li regarding the proposed transaction. Eugene specifically asked Li at these meetings whether SB could maintain its large volume of sales with SCHOT, to which Li again replied that there were "no problems" with SCHOT and that the business was concentrated with SCHOT because the company was closely aligned with the Chinese government, and also has a wide distribution channel through which it can sell SB's products.

**D.     The Securities Purchase Agreement**

32.     Unaware of the materially false and misleading nature of the documentation and statements upon which it was relying, TECO proceeded with the purchase of SB's securities.  On August 21, 2007, Pratt provided Li with SB's final calculation of the per share price of the $3.1 million shares TECO intended to buy -- $6.4852 per share, which was based on the trumped-up price of SB's shares over the prior 15 trading days.  Later that day, Li communicated that information to TECO.

33.     On August 23, 2007, TECO and SB entered into the Agreement (which was signed by Li), pursuant to which TECO purchased 3,083,945 shares of SB's common stock at the fraudulently inflated $6.4852 per share, for a total investment of $20 million.

34.     Pursuant to Article III, Section 3.1, of the Agreement, Defendants caused SB to give TECO the following pertinent representations and warranties (each of which were false):

a.     "The SEC Reports complied in all material respects with the requirements of the Securities Exchange Act and the rules and regulations of the Commission promulgated thereunder, and none of the SEC Reports, when filed, contained any untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading."

b.     "The financial statements of the Company included in the SEC Reports comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing.  Such financial statements have been prepared in accordance with [GAAP], except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of [SB] and its consolidated subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments."

c.     "Since June 30, 2007, the Company has not experienced or suffered any Material Adverse Effect. Neither the Company nor any of its Subsidiaries has any liabilities, obligations, claims, or losses (contingent or otherwise) other than (A) those incurred in the ordinary course of business, (B) those set forth in the SEC Reports, and (C) liabilities not required to be reflected in the Company's financial statements pursuant to GAAP or required to be disclosed in filings made with the Commission.  Except for the issuance of the Shares contemplated by this Agreement or as set forth in the SEC Reports, since June 30, 2007, no event or circumstance has occurred or exists with respect to [SB] or its Subsidiaries or their respective business, properties, prospects, operations or financial condition, that, under applicable law, rule, or regulation, requires public disclosure or announcement by [SB] but which has not been so publicly announced."

d.     "[SB] and the Subsidiaries maintain [an adequate] system of internal controls [over its financial reporting]."

**E.**   **The Truth Is Revealed -- SB Discloses That Its Prior Statements Were False And Misleading**

35.    On September 11, 2007, Defendants caused SB to issue a press release announcing, without any explanation, that it was postponing the filing of its Form 10-K for the fourth quarter 2007 ended June 30, 2007 ("Fourth Quarter/FYE 2007").

36.    On September 12, 2007 -- a mere 20 days after TECO's deal with SB closed -- Defendants caused SB to issue a press release announcing significantly weaker than projected quarterly results for Fourth Quarter/FYE 2007 as follows: (a) revenue was $205.3 million and net income was $8.4 million (which met expectations); (b) accounts receivable from SCHOT was $138.1 million, with none of the receivables purportedly more than 120 days past due; (c) SB had $78.1 million outstanding under its credit line which, according to a statement made by Pratt in the follow-up conference call, was "virtually all of [SB's] borrowing base capacity."

37.    SB also projected for the first quarter 2008 ending September 30, 2007 ("First Quarter 2008") (a) revenue of $170 to $180 million, which was significantly below SB's prior projection of revenues of $254 million; (b) shipments of LCD televisions of between 270,000 to 290,000 units; and (c) projected revenues for calendar year 2007 of $1.0 to $1.1 billion, which was significantly below SB's previous guidance given just two months earlier.  SB stated that the current business outlook "reflects [SB's] decision to take a more cautious approach to sales in Asia" and blamed a tighter credit environment in Asia for the revenue shortfall.  During a conference call with analysts the same day, Sollitto stated that SB was scaling back its shipments to China.

38.    Also on September 12, 2007, SB announced in a separate press release the resignation of Pratt, and that SB expected Pratt to relinquish his SB responsibilities by the end of September.

39.    On September 13, 2007, Defendants caused SB to finally file its Form 10-K with the SEC for the Fourth Quarter/FYE 2007 (which was signed by Sollitto and Pratt), which included a report from SB's outside auditor, Ernst & Young, who after conducting

an internal audit of the SB's internal controls and policies, concluded that there were

several material weaknesses and deficiencies that needed to be corrected, stating that:

> In our opinion ..., [SB] has not maintained effective internal control over financial reporting as of June 30, 2007, based on the COSO criteria.

40.     Notably, SB stated in its Form 10-K for the Fourth Quarter/FYE 2007 that:

> Our independent registered public accounting firm identified a number of adjustments which were in addition to those relating to the material weaknesses .... This has caused us to conclude that controls related to our analysis, evaluation, and review of the Company's 2007 financial information which gave rise to the adjustments has resulted in a material weakness.
>
> *     *     *
>
> In aggregate, these control deficiencies result in a more than remote likelihood that a material misstatement to our annual or interim consolidated financial statements could occur and not be prevented or detected in a timely manner. The foregoing material weakness resulted in adjustments to certain accounts in the Company's 2007 financial statements, including fixed assets, other current and long-term assets, accounts payable, accrued liabilities and other operating expenses.
>
> Because of the material weaknesses described above, management's assessment is a conclusion that, as of June 30, 2007, our internal control over financial reporting was not effective based on the COSO criteria.

41.     On that same day, SB's common stock plunged from $6.13 to $4.01 per

share (a more than 34.6% decline), on volume of more than 36 million shares.

42.     On September 20, 2007, SB announced that John S. "Jack" Hodson

("Hodgson") would replace Pratt as appointed CFO, effective October 1, 2007.

43.     On October 1, 2007, SB announced that Sollitto was replaced as CEO by

Li, who also retained his title as President, and that Sollitto would remain as Executive

Chairman of SB's BOD.

44.     On October 9, 2007, SB issued a press release announcing a comprehensive

"120-day action plan" by SB's management and BOD, the key components of which

include, among other things, "[e]valuat[ing] [SB's] corporate infrastructure and processes

with the aim of reducing costs, optimizing allocation of assets, and improving productivity, profits, and overall performance"; "[e]valuat[ing] how [SB] does business in China with a focus on quality of earnings in China and increasing worldwide sales"; and "[f]ocus[ing] on meeting any additional near-term capital needs with debt instruments."

45.     On October 30, 2007, SB announced that it secured a five-year $250 million senior secured credit facility arranged by Silver Point Finance, which would be used to repay and extinguish approximately $80 million drawn against existing credit facilities, and purchase LCD panels, and for general corporate and working capital purposes.  Li stated that the credit facility could also be used to finance up to 85% of North American inventory and accounts receivable, and up to 25% of accounts receivable from SCHOT.  Interest on the credit facility would be paid at an annual rate equal to, at SB's option, LIBO plus 6% or Prime plus 5%.  Silver Point Finance was to receive ten-year warrants exercisable into approximately 5.28 million shares of common stock at an exercise price of $0.01 per share.

46.     On November 8, 2007, SB announced its actual results for First Quarter 2008.  The results were significantly worse than what SB had announced on September 12, 2007, when there was less than three weeks left in the quarter, and only *20 days* after TECO purchased more than 3 million SB shares.  Revenues were $150.6 million, significantly below the $170-180 million that had been projected in September.  SB also declined to give guidance for the quarter ending December 31, 2007.

47.     SB also shockingly announced that it had ended its exclusive distributor agreement with SCHOT.  Rather than manufacturing and shipping televisions directly to SCHOT, and immediately recording the revenue, SB announced that it would now license the "Olevia" brand in Asia to a third-party, Olevia Far East, which would be responsible for all aspects of selling the televisions in Asia, with SB just receiving a fee for each television sold.

14

48.   SB further announced that it had shipped $56.1 million in product to Olevia Far East during the First Quarter 2008, but because these shipments did not conform with the appropriate accounting standards for revenue recognition, specifically Staff Accounting Bulletin 104, and due to lack of collection history and credit worthiness with Olevia Far East, SB deferred revenue recognition until payments were received.

49.   In the First Quarter 2008, SB made little progress in collecting payment on televisions shipped to SCHOT during the prior fiscal quarters.  Despite the fact that SB ended shipments of LCDs to SCHOT altogether in the First Quarter 2008, accounts receivable owed from SCHOT was $123.2 million as of September 30, 2007, which was only $14.9 million less than the $138.1 million that SCHOT owed SB as of June 30, 2007.

50.   On November 15, 2007, before the market opened, SB filed its Form 10-Q/A with the SEC (amending its November 14, 2007 Form 10-Q filing) for the First Quarter 2008, wherein SB reported that (1) it shipped only 240,000 units in the First Quarter 2008, which is substantially below SB's September 12th projection of 270-290,000; (2) of the $123.2 million owed to SB by the SCHOT, $98 million of that was more than 120 days past due as of November 8, 2007; and (3) SB also indicated in the Form 10-Q that its Chief Accounting Officer resigned in October 2007.

51.   On November 15, 2007, shares of SB closed at $2.89, a decline of approximately 10% from the prior day's closing price.

52.   On February 11, 2008, SB announced, among other things, that it would delay releasing its financial statement for the second fiscal quarter ended December 31, 2007, because it needed additional time to evaluate its accounting treatment related to its tooling deposits with Kolin.

53.   On February 21, 2008, shares of SB closed at $.90, a decline of approximately 115%, between February 11, 2008 and February 21, 2008.

54.   On March 27, 2008, Hodgson resigned as CFO.

55.    On April 18, 2008, SB *admitted* in a press release that its financial statements could not be trusted and "may likely require restatement."  Specifically, SB stated that:

> as previously stated on February 11, 2008, [SB] management, working with the Audit Committee of the [BOD], has been evaluating its accounting treatment related to tooling deposits with a manufacturing partner.  Based on the preliminary findings of the review of the accounting for the tooling deposits, as well as certain sales transactions with [SB's] Asian distributors, management and the Audit Committee believe that the financial statements for the fiscal year ended June 30, 2007 and the interim periods contained therein, and the first fiscal quarter of 2008 may likely require restatement, and the financial disclosures within these previously-issued financial statements may likely be changed.  As such [SB's] financial statements for these periods should no longer be relied upon.  At the present time, [SB] is uncertain as to the resulting impact on its financial statements or when the Audit Committee's review of these accounting matters will be completed.

56.    On June 5, 2008, SB terminated Sollito and Li, and experienced the resignations of two members of the SB's BD, including Man Kit (Thomas) Chow and Christopher C.L. Liu (who also served as Kolin's President and as a member of its BOD).

57.    In light of the foregoing, the statements referenced in paragraphs 15 through 28, and 30 through 34, were materially false and misleading, or omitted to state other facts necessary to make the statements not misleading, because: (a) SB's reported revenue, accounts receivable, net income and LCD and HDTV units sold for the Third Quarter 2006, Fourth Quarter/FYE 2006, and First, Second and Third Quarters of 2007 were artificially inflated; (b) there was insufficient end-user demand in China to warrant the quantity of LCD and HDTF units shipped to SCHOT during the Third Quarter 2006, Fourth Quarter/FYE 2006, and First, Second and Third Quarters of 2007; (c) the Third Quarter 2006, Fourth Quarter/FYE 2006, and First, Second and Third Quarters of 2007 did not fairly present SB's financial condition and results of operations; (d) SB's negative working capital and cash flow was caused by SCHOT's failure to pay for televisions that it received but was unable to sell; (e) SB's cash from operations and credit facilities were

16

not sufficient to sustain operations; and (f) SB did not maintain adequate controls over its financial reporting.

F.  **SB Files For Voluntary Bankruptcy And Is The Subject Of SEC And Judicial Scrutiny**

58.     On July 8, 2008, SB, and certain of its affiliates, filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, in the Bankruptcy Court, and claimed that nearly *one-half billion dollars* in shareholder's equity vanished in approximately 9 months.

59.     The SEC has recently sent SB a letter of inquiry, focusing on "various financial and accounting issues beginning July 1, 2005 including the accounting treatment of tooling deposits, cash advances to Asian manufacturers, outstanding accounts receivable, inventory returns, internal control issues, and [the Company's] supply chain relationships in Asia."

60.     On July 28, 2008, the United States Trustee made a motion (the "Trustee's Motion") to the Bankruptcy Court for the appointment of an independent examiner to investigate, among other things, "the facts and circumstances surrounding the sudden decline in [SB's] assets or value thereof."  The Bankruptcy Court stated that it will grant the Trustee's Motion.

G.  **Loss Causation/Economic Loss**

61.     Defendants' false and misleading statements had their intended effect and caused SB's common shares to trade at artificially inflated levels from at least May 15, 2006 through August 23, 2007 (the "Relevant Period"), trading as high as $6.60 per share.  In fact, TECO was fraudulently induced to buy SB's stock near that high -- $6.4852.

62.     On September 12, 2007, SB significantly lowered its revenue guidance for the First Quarter 2008 and FYE 2007.  For the First Quarter 2008, SB projected revenue of $170 - $180 million, which was significantly below SB's prior revenue projection of $254 million.  SB also projected revenues for calendar year 2007 of $1.0 to $1.1 billion, which was also significantly below SB's previous guidance.  According to SB, the lower

revenue guidance was caused by, among other reasons, a more cautious approach to sales in Asia.  On September 13, 2007, when Defendants caused SB to file its Fourth Quarter/FYE 2007 Form 10-K, SB reiterated its September 12th financial disclosures, and also released E&Y's Report, which stated that SB "has not maintained effective internal control over financial reporting as of June 30, 2007".  Based on these revelations, SB's stock dropped $2.12 or 34.6%, to close at $4.01, thereby causing TECO to suffer damages.

63.     On November 15, 2007, SB announced that $98 million owed to SB from SCHOT, out of $123.2 million in total, was more than 120 days past due as of November 8, 2007, and that SB's Chief Accounting Officer left SB in October 2007.  On this news, SB's shares declined 10% to close at $2.89, thereby causing TECO to suffer further damages.

64.     On February 11, 2008, SB announced, among other things, that it was delaying the release of its financial statement for the second fiscal quarter ended December 31, 2007, because it requires additional time to evaluate its accounting treatment related to its tooling deposits with Kolin.  Based on these revelations, on February 21, 2008, shares of SB closed at $.90, a decline of approximately 115% between February 11, 2008 and February 21, 2008, thereby causing TECO to suffer even further damages.

**H.     Fraud On The Market Allegations**

65.     The market for SB's securities was open, well-developed and efficient at all relevant times.  SB's securities traded at artificially inflated prices during the Relevant Period as a direct result of Defendants' materially false and misleading statements and failures to disclose, which had the effect of creating in the market an unrealistically positive assessment of SB and its business and operations.  TECO purchased SB's securities relying upon the integrity of the market price (which Pratt specifically used to calculate the per share purchase price) of SB's securities and SB-related market information, and has been damaged thereby.

66.     During the Relevant Period, Defendants materially misled the investing public, including TECO, thereby inflating the price of SB's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make statements not false and misleading.  These statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about SB's business and operations.

67.     The statements detailed in paragraphs 15 through 28 and 30 through 34, above, concerning SB's revenues, profitability and demand for its products in China, were materially false and misleading because, among other things:  (a) SB "channel stuffed" thousands of LCD televisions to SCHOT, without sufficient end-user demand, to increase artificially SB's reported revenues and net income; (b) SB's failure to meet first and second quarter 2008 revenue and earnings guidance was not the result of tightening credit in Asia, but rather the result of too many unsold televisions held by SCHOT and a lack of real consumer demand for SB's televisions in China; (c) SB's negative working capital and cash flow were caused by SCHOT's failure to pay for televisions that it received but was unable to sell; (d) SB's cash from operations and credit facilities were not sufficient to sustain operations for the next twelve months, absent several offerings of SB's common stock, including the issuance of warrants to purchase 5.28 million shares at $0.01 per share in order to secure a new $250 million credit facility from Silver Point Finance; (e) SB did not maintain adequate controls over its financial reporting; and (f) SB's financial reports did not fairly present.

**I.     Additional *Scienter* Allegations**

68.     Defendants acted with *scienter* in that they knew that the public documents and statements issued or disseminated in the name of SB (which Defendants signed and/or approved or certified the contents of such documents and statements) were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public and specifically provided the same to TECO in connection with its due diligence review; and knowingly and substantially participated or

acquiesced in the issuance of dissemination of such statements or documents in primary

violations of the federal and state securities laws.

69.     Defendants, by virtue of their receipt of information reflecting the true facts

regarding SB, their control over and/or receipt and/or modification of SB's allegedly

materially misleading misstatements and/or their associations with SB which made them

privy to confidential proprietary information concerning SB, participated in the

fraudulent scheme alleged herein.

70.     Because of their executive and managerial positions with SB, Defendants

had access to the adverse non-public information about the business, finances, markets

and present and future business prospects of SB through internal corporate documents,

conversations or connections with corporate officers or employees, attendance at

management meetings and committees thereof and/or through reports and other

information provided to them in connection therewith.

71.     Defendants had a duty to promptly disseminate accurate and truthful

information with respect to SB's operations and financial condition or to cause and direct

that such information be disseminated and to promptly correct any previously

disseminated information that was misleading to the market.  As a result of their failure to

do so, the price of SB's common stock was artificially inflated during the Relevant

Period, thereby damaging TECO.

72.     Defendants, because of their positions with SB, controlled the contents of

the quarterly reports, annual reports and press releases disseminated throughout the

Relevant Period and specifically provided the same to TECO.  Defendants obviously

controlled the contents of the statements expressly made to TECO.  Each of the

Defendants was provided with or had access to copies of the reports and press releases

alleged herein to be false and/or misleading prior to or shortly after their issuance and had

the ability and opportunity to prevent their issuance or cause them to be corrected.

Because of their positions and access to material non-public information, Defendants

knew or recklessly disregarded that the adverse facts specified herein had not been

disclosed to and were being concealed from the TECO and public and that the positive representations which were being made were false and misleading.  As a result, each of the Defendants is responsible for the accuracy of SB's corporate releases, as well as the statements expressly made to TECO, as  detailed herein, and is therefore responsible and liable for the representations contained therein.

73.     Each of the Defendants is liable as a primary violator in making false and misleading statements, and for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on TECO.

74.     Defendants acted with *scienter* in that each defendant knew or recklessly disregarded that the public and private documents and statements, issued or disseminated by or in the name of SB were materially false and misleading, knew or recklessly disregarded that such statements or documents would be issued to the investing public, and specifically provided the same to TECO, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal and state securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding SB and its business practices, their control over and/or receipt of SB's allegedly materially misleading misstatements, and/or their associations with SB which made them privy to confidential proprietary information concerning SB, were active and culpable participants in the fraudulent scheme alleged herein.  Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated or otherwise provided to the investing public and TECO.  The ongoing fraudulent scheme described herein could not have been perpetuated over a substantial period of time, as has occurred, without Defendants' knowledge and acquiescence.

75.     Defendants engaged in this scheme to ensure that the Agreement with TECO closed.  But for Defendants' fraudulent conduct, SB would not have been able to complete the offering to TECO at all or, if completed, not at the per share price at which the securities were sold to TECO.

**J.**    **No Safe Harbor**

76.    The statutory safe harbor provision that provides for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements identified herein.  The specific statements pleaded herein were not identified as "forward-looking statements" when made, including, without limitation, the express statements made by Defendants to TECO.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements identified herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, Defendants knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by Defendants who knew that those statements were false when made.

**FIRST CLAIM FOR RELIEF**
**(Violation of Section 10(B) of the Exchange Act and**
**Rule 10b-5 of the Securities and Exchange Commission)**

77.    TECO repeats and realleges the allegations of paragraphs "1" through "76" above, as if fully set forth herein.

78.    This claim for relief is based upon Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Rule 10b-5 promulgated thereunder.

79.    During the Relevant Period, Defendants engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly and recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon TECO, and made various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to TECO.  The purpose and effect of said scheme, plan, and unlawful course

of conduct was, among other things, to induce TECO to enter into the Agreement and to purchase more than 3 million shares of SB stock at artificially inflated prices.

80.     During the Relevant Period, Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to TECO.

81.     As a result of Defendants' dissemination of and/or failure to correct the false and misleading statements set forth above, the market price of SB's securities was artificially inflated during the Relevant Period.  Unaware of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by Defendants, TECO purchased SB's securities and relied to its detriment on the integrity of the market price of the stock in purchasing SB's securities.

82.     As a result of the dissemination of the false and misleading statements set forth above, the market price of SB's common stock was artificially inflated at the time TECO purchase said stock pursuant to the Agreement.

83.     TECO relied, to its detriment, on the integrity of the market price of the stock, as well as the documents, information and express statements provided and/or made by Defendants to TECO when entering into the Agreement.  Had TECO known the truth, it would not have entered into the Agreement and purchased 3.1 million shares of SB's stock at an inflated price.

84.     TECO has suffered substantial damages as a result of the wrongs alleged herein.

85.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts,

23

practices, and a course of business which operated as a fraud and deceit upon TECO in connection with its purchase of SB's common stock pursuant to the Agreement.

## SECOND CLAIM FOR RELIEF
### (Violation of Section 20(a) of the Exchange Act)

86.     TECO repeats and realleges the allegations of paragraphs "1" through "85" above, as if fully set forth herein.

87.     Defendants are controlling persons of SB within the meaning of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

88.     By virtue of their high-level positions, participation in and/or awareness of SB's operations and financial situation, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of SB, including the content and dissemination of the various statements that were false and misleading.  Defendants were provided with or had unlimited access to copies of SB's reports, press releases, public filings and other statements alleged by TECO to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

89.     In particular, Defendants had direct and supervisory involvement in the day-to-day operations of SB and, thus, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercise the same.

90.     By virtue of their position as controlling persons, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

91.     As a direct and proximate result of Defendants' wrongful conduct, TECO suffered damages in connection with its entering into the Agreement and its purchase of 3.1 million shares of SB's common stock for $20 million.

24

**THIRD CLAIM FOR RELIEF**
**(Violation of Section 18 of the Exchange Act)**

92.    TECO repeats and realleges the allegations of paragraphs "1" through "91" above, as if fully set forth herein.

93.    TECO asserts this claim against Defendants pursuant to Section 18 of the Exchange Act.

94.    Defendants made and/or caused to be made statements in applications, reports and documents which were publicly filed, and such statements were at the time and in light of the circumstances under which they were made false and/or misleading with respect to the facts contained therein.

95.    TECO read and relied upon SB's Third Quarter 2006 Form 10-Q/A, FYE 2007 Form 10-K/A, First Quarter 2007 Form 10-Q/A, Second Quarter 2007 Form 10-Q, and Third Quarter 2007 Form 10-Q ("SB's SEC Filings"), as well as the false and/or misleading statements contained therein, not knowing that they were false.

96.    TECO knew at the time that it read and relied upon SB's SEC Filings that they had been publicly filed.

97.    TECO purchased SB's stock pursuant to the Agreement, based on the false and/or misleading statements alleged herein, including those statements contained in SB's SEC Filings.

98.    When the truth began to emerge about the false and misleading statements and omissions that were contained in SB's SEC Filings, TECO was significantly damaged by the resulting drop in value of SB's stock.

99.    As a direct and proximate cause of Defendants' wrongful conduct, TECO suffered damages in connection with its purchase of SB's stock pursuant to the Agreement.

100.    By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act and are liable thereunder to TECO.

### FOURTH CLAIM FOR RELIEF
### (Violation of A.R.S. Section 44-1991 and 44-2003)

101.    TECO repeats and realleges the allegations of paragraphs "1" through "100" above, as if fully set forth herein.

102.    Arizona's Blue Sky laws (Arizona Securities Act, A.R.S. § 44-1801 *et seq.*) apply to the alleged transaction given, among other things, that: (1) SB's principal executive offices were located in Arizona; (2) the Agreement provides that (a) the parties shall submit to the exclusive jurisdiction of the state and federal courts of Arizona with respect to certain disputes concerning the Agreement; (b) any requisite notices be sent to SB's Arizona location, with a copy to SB's corporate counsel, also located in Arizona; (3) the closing of the transaction reflected by the Agreement was scheduled to, and, in fact, did, occur in Arizona; (4) certain officers, including Solitto, Li and Pratt, resided and/or worked in Arizona; (5) the press releases at issue were issued from Arizona; and (6) the SEC filings identify Arizona as the state in which SB's principal offices are located and provide SB's Arizona-based telephone number.

103.    A.R.S. § 44-1991(A)(1) prohibits any "device, scheme or artifice to defraud" in connection with the purchase or sale of a security.  A.R.S. § 44-1991(A)(2) provides that it is a fraudulent practice to offer or sell securities by making "any untrue statement of fact" or "omit[ting] to state any material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  A.R.S. § 44-1991(A)(3) makes it unlawful to "engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit."

104.    The SB common stock TECO purchased pursuant to the Agreement constitutes a "security" under A.R.S. § 44-1991.

105.    The conduct of Defendants as alleged herein constitutes a violation of A.R.S. § 44-1991.

106.   Defendants participated in or induced the unlawful sale of the securities to TECO.  Pursuant to A.R.S. § 44-2003(A), Defendants, due to their knowing or reckless conduct, are liable for their own and for SB's violations of A.R.S. § 44-1991.

107.   As a result of Defendants' violation of A.R.S. § 44-1991, TECO has been damaged seeks to recover such damages against Defendants, plus interest, attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF**
**(Violation of A.R.S. Section 44-1999)**

108.   TECO repeats and realleges the allegations of paragraphs "1" through "107" above, as if fully set forth herein.

109.   Defendants were control persons with the power to control or influence SB under A.R.S. § 44-1999.

110.   With respect to the securities violations described in TECO's Fourth Claim for Relief, Defendants are jointly and severally liable to TECO as controlling persons under A.R.S. § 44-1999.

111.   As a result of Defendants' violation of A.R.S. § 44-1999, TECO has been damaged seeks to recover such damages against Defendants, plus interest, attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF**
**(Violation of 4 Cal. Code Section 25504)**

112.   TECO repeats and realleges the allegations of paragraphs "1" through "111" above, as if fully set forth herein.

113.   California's Blue Sky laws (California Corporate Securities Act, 4 Cal. Corp. Code § 25000 *et seq*.) apply to the alleged transaction given, among other things, that Li, whose office was situated at SB's California headquarters, located in the City of Industry, originated the offer to sell SB's securities to TECO; (2) TECO conducted its due diligence review in California; and (3) TECO purchased the shares in California by wiring the $20 million to an SB bank account in California.

114.    California Code § 25401 "makes it unlawful for any person to offer or sell a security in this state or by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

115.    California Code § 25501 provides that "[a]ny person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages …."

116.    The SB common stock TECO purchased pursuant to the Agreement constitutes a "security" under California Code § 25019.

117.    SB's conduct  as alleged herein violated California Code § 25401.

118.    Defendants were control persons under California Code § 25504, and (as described herein) materially aided in SB's violation of California Code § 25401.

119.    As a result of Defendants' violation of California Code § 25504, TECO has been damaged and seeks to such recover damages against Defendants, plus interest, attorneys' fees and costs.

120.    **WHEREFORE,** for the foregoing reasons, TECO demands judgment against Defendants as follows:

      A.     on its First Claim for Relief, awarding TECO compensatory damages against Defendants in an amount not less than $20 million, plus interest thereon;

      B.     on  its Second Claim for Relief, awarding TECO damages against Defendants in an amount not less than $20 million, plus interest thereon;

      C.     on its Third Claim for Relief, awarding TECO damages against Defendants in an amount not less than $20 million, plus interest thereon;

      D.     on its Fourth Claim for Relief, awarding damages against Defendants in an amount not less than $20 million, plus interest thereon;

      E.     on its Fifth Claim for Relief, awarding damages against Defendants in an amount not less than $20 million, plus interest thereon;

F.    on its Sixth Claim for Relief, awarding damages against Defendants in an amount not less than $20 million, plus interest thereon;

G.    reimbursement of the costs and expenses of this action, including reasonable attorneys' and expert witness fees; and

H.    for such other and further relief as the Court deems just and proper.

## JURY DEMAND

TECO demands a trial by jury.

DATED this 20th day of August, 2008.

> HAHN & HESSEN LLP
> John P. Amato
> Robert J. Malatak
>
> and
>
> LEWIS AND ROCA LLP
>
> By  *s/ Richard A. Halloran*
> Richard A. Halloran
> Shane E. Olafson
> Attorneys for Plaintiff

29